# EXHIBIT 1

*STEADMAN* TRANSCRIPT

```
                                                                        1

 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - - - - X
      HILLARY STEADMAN and              :
 3    KRISTIN HERBECK, on behalf        :  25-CV-4081(RER)
      of themselves and all             :
 4    others similarly situated,        :
                                        :  United States Courthouse
 5                   Plaintiffs,        :  Brooklyn, New York
                                        :
 6           -against-                  :
                                        :  November 4, 2025
 7    THE CITY OF NEW YORK, NYPD        :  10:30 a.m.
      MEMBER JACOB CRAIG; NYPD          :
 8    MEMBER CANDICE RICHARDS           :
      (Shield No. 8120); NYPD           :
 9    MEMBERS JOHN AND JANE DOES        :
      1-20,                             :
10                                      :
                     Defendants.        :
11    - - - - - - - - - - - - - - - - - X

12    ─────────────────────────────────────────────────────────────

          TRANSCRIPT OF CIVIL CAUSE FOR PREMOTION CONFERENCE
13              BEFORE THE HONORABLE RAMON E. REYES
                  UNITED STATES DISTRICT JUDGE
14    ─────────────────────────────────────────────────────────────

15                   A P P E A R A N C E S:

16   For the Plaintiff:   MASSIMI LAW PLLC
                               90 Wall Street, Suite 1264
17                             New York, New York 10005
                          BY:  JESSICA S. MASSIMI, ESQ.
18
                          BEDLOCK LEVINE & HOFFMAN LLP
19                             99 Park Avenue, PH/26th Floor
                               New York, New York 10016
20                        BY:  DAVID RANKIN, ESQ.

21   For the Defendants: NEW YORK CITY LAW DEPARTMENT
                               100 Church Street
22                             New York, New York 10007
                          BY:  JOANNE M. McLAREN, ESQ.
23   REPORTED BY:
     Kristi Cruz, RMR, CRR, RPR
24   Official Court Reporter
     kristi.edny@gmail.com
25
     Reported by computerized stenography using Computer-Aided Transcription.
```

PROCEEDINGS  2

1           (In open court.)
2           THE COURTROOM DEPUTY: Civil Cause for Pre-motion
3  Conference in *Steadman versus the City of New York, et al.*,
4  docket number 25-CV-4081, before the Honorable Ramon E.
5  Reyes, Jr., United States District Judge presiding.
6           Counsel for the plaintiff, please state your name
7  for the record.
8           MS. MASSIMI: Good morning, Your Honor.
9           Jessica Massimi, Massimi Law PLLC.
10          With me is one of my co-counsel, Dave Rankin, with
11 Beldock Levine & Hoffman.
12          MR. RANKIN: Good morning, Your Honor.
13          THE COURT: Good morning.
14          THE COURTROOM DEPUTY: Counsel for the defendant,
15 please statement your name for the record.
16          MS. McLAREN: Good morning, Judge Reyes.
17          Joanne McLaren from the Office of the Corporation
18 Counsel of the City of New York, for defendants the City of
19 New York, defendant Detective Jacob Craig, and defendant
20 Police Officer Candice, C-A-N-D-I-C-E, Richards.
21          Good morning, Your Honor.
22          THE COURT: Good morning.
23          Before we talk about transfer, Ms. Massimi, just
24 tell me about the case, please, or Mr. Rankin.
25          MR. RANKIN: Yes, if you don't mind, Your Honor.

PROCEEDINGS 3

1  THE COURT:  That's okay.
2  MR. RANKIN:  In the division of labor, I'm the
3  generalist on this case; she's just handling this specific
4  motion.
5  THE COURT:  Okay.  You can stand or sit, whatever
6  is comfortable for you.
7  MR. RANKIN:  Okay, cool.  As Your Honor, of
8  course, knows, this is a punitive class actions with two
9  individuals as named plaintiffs.  The central piece of it is
10  April 30, 2024.  There was an occupation at CUNY related to
11  the uprising in Gaza and all of the various things happening
12  there, and that's what was happening in our city.  The NYPD
13  kicks everybody out of CUNY in the occupation itself, like
14  inside the campus, and moves them all outside.
15  Once they get outside, that's where our case comes
16  in, right?  We have no allegations about behavior or conduct
17  of the NYPD inside the campus, okay?  People get moved
18  outside.  There were people outside to begin with.  I mean,
19  it wasn't like there were no people outside.  There were a
20  ton of people outside.  But once everybody gets outside,
21  what happens is the NYPD starts to kettle people, they start
22  to assault people, and end up arresting 148 people kind of
23  basically, like, right there between 135th and 138th on
24  Amsterdam Avenue, you know, and all the mishegas that goes
25  with arresting and processing that large group of people.

PROCEEDINGS                                    4

1      The two plaintiffs are good class reps because
2 they were both outside, they were both subjected to the NYPD
3 violence.  The --
4           THE COURT:  Well, were they inside, then outside?
5           MR. RANKIN:  No.
6           THE COURT:  They were always outside?
7           MR. RANKIN:  They were always outside.
8           THE COURT:  Okay.
9           MR. RANKIN:  And that's what I believe you're
10 going to find as the majority of the humans that were
11 outside that were actually subjected to the allegations that
12 we are alleging in our class.  Not all of them, but I think
13 the vast majority of them.
14           So we what have is we have kettling, police
15 surrounding people, police using unnecessary force.  Our
16 central allegations are the failure to train on protests,
17 right?  I mean, basically with the allegations that the City
18 has had a longstanding policy of not trying to facilitate
19 protests; in fact, have had a mind set of trying to suppress
20 protests.  I mean, this goes back a really long time.  It's
21 been like the one through line in my career.  I've been
22 saying the same thing for 20 years.
23           The piece here, really, that sort of a -- maybe
24 makes that different from some of those other cases is the
25 force.  And that's really the thing that I think is going to

PROCEEDINGS 5

1  become the centerpiece of this case and cases around the
2  Gaza uprising in New York City generally.
3           You know, we have the George Floyd protests,
4  right, which had all of their things.  There was all that
5  settlement, there was the training, there's all of the
6  various different things that happened.  And then have you
7  these Gaza protests, which the force used by the NYPD is
8  like nothing we've ever seen.  It shows, I think, clearly
9  that what's happened in the city, especially with the police
10 department under Mayor Adams, is they just have not
11 disciplined anybody for it, right?
12          I mean, we had a whole situation where they could
13 have taken it seriously with the George Floyd protests and
14 disciplined some people, like actually shown that you can't
15 just go beat up a bunch of protesters.  But instead of doing
16 that, they didn't, and part of the result of that lack of
17 discipline there and also the encouragement of the
18 higher-ups around the Gaza protest is what led to the police
19 violence, which is why we have individual named defendants
20 of these two officers.  But really, I mean, our allegations
21 are from top down this is what the City of New York has been
22 doing to protesters for a really long time.
23          You know, we have the MAPC issue, which the MAPC
24 is the Mass Arrest Processing Center, and what happens there
25 is you have somebody --

1        THE COURT:  MAPC?

2        MR. RANKIN:  Yes, exactly, M-A-P-C.  What happens
3  there is, so say I'm outside committing disorderly conduct
4  here, right?  They're going to issue me a summons and likely
5  send me on my way.  If I am engaging in disorderly conduct
6  as a protest, that's not what happens to me.  What happens
7  to me is, I get shipped off to a MAPC center and processed
8  for between four and six hours.  It's our allegation that
9  that's a violation of equal protection because you have the
10 same conduct, and you have the person who is exercising
11 their First Amendment rights treated more harshly.  That's
12 how that argument works.  I will be frank, we have met with
13 mixed results in raising that claim, but we still think it
14 works and we keep bringing it.

15        The Monell claims, we have one of the things that
16 we saw in -- both in the George Floyd protests and -- George
17 Floyd was actually -- I think we saw this mostly there and
18 then in the Gaza protests.  I was one of the attorneys on
19 one of the class actions there, is that where handcuffs were
20 used, they were used in a way that caused some pretty
21 serious injuries.  The number of nerve crush injuries that
22 we dealt with were really, I mean, again, of a nature that
23 we had not seen before.  I think out of the Black Lives
24 Matter protests, I think we saw two actual nerve crush
25 injuries; real, like, substantive nerve crush injuries.

PROCEEDINGS 7

1  After the George Floyd protest, there were a lot of them.
2  And here, again --
3          THE COURT:  As far as handcuffs are concerned,
4  they used the zipties?
5          MR. RANKIN:  Yeah, yeah, they were doing the
6  zipties.  And they were doing it in a way that is punitive,
7  right?  I mean, look, the handcuff training that the PD has
8  is, you know, you put two fingers underneath the handcuff,
9  you -- you know, their training itself on handcuffing is,
10 you know, how you're supposed to do handcuffs.  But in
11 practice, what they're doing in a lot of instances is using
12 them punitively, and that's one of the allegations that we
13 have in this complaint for one of our named plaintiffs.
14         The reason I'm focusing on that is, that was
15 something that we'd seen sort of as a change in the policing
16 of protests over the last couple of decades, really.  But it
17 needs to stop.  I mean, they're really hurting people.  And
18 that's what we're doing here.  That's the -- obviously it's
19 a punitive class action, we need to figure out -- you know,
20 we need to get a class briefing schedule together to present
21 the arguments to Your Honor to see if we can get this class
22 certified and, you know, and deal with this particular date.
23         One of the things that's nice about -- and one of
24 the reasons that we've decided to split it, you know, to do
25 just at particular date is, there's a lot to us that's

PROCEEDINGS 8

1  unique about this protest, right?  It was one of the ones
2  where the police tactics, we think, were both particularly
3  egregious and also sort of distinct, right?  I mean, we have
4  a limited area, we have a finite number of people, we have
5  tactics that are kettling, we have tactics that are force.
6  And we didn't want this case to get subsumed in any larger
7  cases or any other protest cases that this collection of
8  attorneys may be bringing, which I'm sure we'll hear some
9  about, because this case is unique and this case is special,
10  and what happened here we really think needs its own
11  microscope and needs its own universe, which is why we filed
12  it this way.
13          I'm happy to answer any questions.
14          THE COURT:  Okay.
15          Ms. McLaren, you want to send this to the Southern
16  District?
17          MS. McLAREN:  Yes.
18          THE COURT:  Why?
19          MS. McLAREN:  This case has just been brought.
20  Plaintiffs have the exact same consortium of plaintiffs'
21  lawyers.  Huge group of plaintiffs' lawyers brought this
22  case already in the Southern District and to excise one
23  little sliver, one little protest.  There were protests
24  before this protest which are included within the Makkawi,
25  M-A-K-K-A-W-I, who brought this class action in the Southern

PROCEEDINGS 9

1  District.  There are protests from after this protest which
2  was included within the Makkawi class action definition.
3          Plaintiffs are trying, clearly, to forum shop.
4  Get discovery, different judges for different discovery
5  issues.  Plaintiffs do discovery twice, depositions twice,
6  Monell discovery twice.  There's the exact same allegations
7  in each complaint.  The exact same allegations of kettling,
8  the same language, the same allegation in both of these
9  complaints.
10         THE COURT:  Are they precisely the same claims,
11 the exact same claims, except for the fact that this is a
12 different protest?
13         MS. McLAREN:  Yes, Your Honor.
14         THE COURT:  Is that correct?  The claims
15 themselves are the same as what's going on in the Southern
16 District except for the fact that this is a different
17 protest?
18         MS. MASSIMI:  The class claims are essentially the
19 same.  The defendants -- to be clear, the defendants are
20 obviously not consenting to any class certification, so
21 they're going to dispute that any class should be certified
22 in any district.  This reference to Makkawi, I understand
23 why the defendants want to bring it up.  They bear the
24 burden of making a clear and convincing showing that
25 transfer is warranted.  They don't even assess all nine

PROCEEDINGS 10

1  factors in their letter because the factors don't work for
2  them.
3          The only factor that's in their favor is that
4  theoretically this case could have been brought in another
5  district.  That is not enough to warrant transfer.  The two
6  named plaintiffs in this case both reside in the Eastern
7  District; Brooklyn and Queens.  All of the other factors are
8  neutral.  Electronic records, the courthouses are two or
9  three miles apart, and, you know, the burden belongs to the
10 defendants.  They have not met their burden.
11         THE COURT:  Ms. McLaren, I sidetracked you a
12 little bit with that question, but why don't you continue
13 with your argument why we should transfer this case.
14         MS. McLAREN:  Same counsel, same claims, judicial
15 efficiency.  One judge will be learning the body camera
16 footage, learning the lay of the land, and we are cutting
17 off a slice to see if we can get slightly different
18 discovery rulings, schedules, or something that's more
19 favorable to plaintiff in another jurisdiction.  Obviously
20 there is no need for this case, this protest to be litigated
21 in two different jurisdictions.  It's duplicating
22 unnecessary work for so many people.
23         MR. RANKIN:  Your Honor, if I may, to that
24 point --
25         THE COURT:  Who would be the members of this

1    class?  It's the people who were arrested at this protest?
2    Would it be that large?
3              MS. MASSIMI:  We understand there to be 148 people
4    who would be a member of this class, and potentially others
5    whose force was used at that location on that date.
6              THE COURT:  But who were not arrested.
7              MR. RANKIN:  Correct.  As far as the issue --
8              THE COURT:  How do you ascertain that?  I mean,
9    how do you -- you're going to have, like, 600 people say I
10   got force used against me?
11             MR. RANKIN:  We have some ideas on it, but to say
12   that's not complicated would, of course, be naive.  That
13   does create some real very serious issues.  It creates very
14   serious issues at the class certification stage.  Addressing
15   ascertainability, I think, for non-arrested humans would be
16   something that we need to explore thoroughly.
17             As far as the burden of work, we can take -- we're
18   not talking about doing two sets of depositions.  We're not
19   talking about doing two sets of everything.  I mean, she's
20   the same attorney on the Southern District action, we're the
21   same attorneys here.  You just put two captions on it.  It's
22   not like it's -- while there are two different actions, it's
23   not a situation where, you know, we're suing a different
24   office that has to do everything twice.  And when we've done
25   actions like this -- I'll just say, for example, in the

PROCEEDINGS                                        12

1  George Floyd protest, there was a class out in Cadman Plaza
2  that was just right here, right?  The rest of the case was
3  litigated in the Southern District.  That all happened
4  together in a fairly seamless way.  There wasn't an issue
5  with it.
6           So the idea that there's somehow a massive
7  inefficiency by doing it this way I think is a misnomer.
8           THE COURT:  In that case, the George Floyd protest
9  that occurred in Cadman Plaza, what happened with that case?
10          MR. RANKIN:  They all ended up settling.
11          THE COURT:  Okay.  Was I a Magistrate Judge on
12 that case?
13          MR. RANKIN:  I'm not sure, Your Honor.  It was --
14          THE COURT:  I do remember Nick Green was an
15 attorney that appeared in front of me, and there was
16 discussion of discovery coordination between the two.
17          MR. RANKIN:  And there was throughout this -- I
18 mean, in that particular case, right, there were a number of
19 individual plaintiffs, right?  For a class case, you don't
20 want the person with the heavy damages because that just
21 wouldn't make sense, right?  I mean, they're obviously not
22 typical.  So there was a ton of individual cases.  You had a
23 class here, had you a class up in the Bronx, you had a
24 lawsuit that spanned the entire series of protests, and
25 everybody sat down and did discovery.  It wasn't like a --

1  well, I'm not going to say the discovery was smooth in the
2  sense of the City producing documents.  It wasn't
3  complicated by the fact that there were multiple plaintiffs,
4  you know what I mean?  There were certainly issues, but they
5  were issues that always exist in this kind of thing.
6          So logistically, it doesn't -- we're not going to
7  take the police commissioner twice, you know what I mean?
8  Like, that wouldn't make any kind of sense.  Nor would an
9  application to either one of the judges allow us to do that.
10         THE COURT:  Have you even taken him once?
11         MR. RANKIN:  No.  I mean, obviously we would have
12 to win our Apex Doctrine motion to compel.  But again, a
13 problem for another day.  But like I said, the logistics of
14 it aren't insurmountable.  Our office, the City's office has
15 done this a lot.
16         Like I said, this protest is special.  It is
17 defined.  It is -- it doesn't bleed out into all of the
18 other protests.  And that's why we did it this way, right,
19 is to make sure that this particular thing didn't get sucked
20 into the rest of them, right, because what happened here is
21 different, what happened here is special, and we wanted to
22 make sure that it got its fair due.
23         THE COURT:  What's the status of the case in
24 Southern District?
25         MR. RANKIN:  We're basically in the same posture

1  we are here.  They're all brand new.
2              THE COURT:  Do you have a scheduling order in that
3  case?
4              MR. RANKIN:  We've been bouncing around a
5  preliminary conference.  We have some issues.  I just heard
6  this morning that the City's contemplating a motion to stay
7  based on some discipline.  But we had not had a preliminary
8  conference in that case, but there's been some sort of
9  preliminary letter writing and motions to extend the
10 conversations.
11             MS. McLAREN:  The answer is not true, Your Honor.
12 We are in the middle of representing 16 defendants in that
13 case, we're working through the representation interviews of
14 the individual defendants in the Makkawi case, but we have a
15 month before our answer is due.  So we're in the very
16 preliminary stages.
17             THE COURT:  And you've worked through the
18 representation issues here?
19             MS. McLAREN:  There's only two officers.
20             THE COURT:  Two officers, right.  It's Malawi
21 (phonetic)?
22             MS. McLAREN:  Makkawi.
23             THE COURT:  How do you spell that, please?
24             MS. MASSIMI:  M-A-K-K-A-W-I.
25             THE COURT:  Okay.

PROCEEDINGS 15

1         MS. McLAREN:  Would you like the docket number,
2 Your Honor?
3         THE COURT:  I think it's in the letters, right?
4         MS. McLAREN:  It is.  It's 25-CV --
5         THE COURT:  That's okay; I don't need it.
6         All right.  So you would envision sort of on the
7 policy issues, if you will, one set of depositions to be
8 used in both cases?
9         MR. RANKIN:  Yes.  I mean, absolutely.
10         THE COURT:  And then -- I'm just trying to see
11 what discovery would be different in this case than in that
12 case.  I guess it would be, you know, these plaintiffs'
13 depositions.
14         MR. RANKIN:  These plaintiffs --
15         THE COURT:  And the individual officers'
16 depositions, because they're not defendants in the other
17 case, correct?
18         MR. RANKIN:  Correct.
19         The thing that would be different about it, Your
20 Honor, is there was a -- and this is, again, the reason that
21 this is separated, right, is there was a plan to get into
22 CUNY to get these people out.  There was a plan to deal with
23 the protesters on the streets that day.  And that goes up to
24 potentially the mayor, right?  So there's a whole vertical
25 of relatively high-end police people about this protest,

1  right?
2         So the discovery -- there's going to be quite a
3  bit of unique discovery to this protest, which is why I
4  think it makes sense to have -- and the reasons we did it
5  this way is to have a case that we can focus on, as opposed
6  to what were you doing for that six-month period of time,
7  what did you do over this arc of pieces, and have it be one
8  of, you know, five major protests or six major protests.
9  This way we have one, we can focus on it, we can understand
10 what happened, and we can understand why the decisions were
11 made.
12        Also, with it being a -- we're talking three
13 blocks, it allows us to really understand this protest and
14 do the discovery for this protest.  The policy things,
15 like the -- I mean, we're not going to litigate the lack of
16 discipline over the history of the NYPD's protesting twice.
17 I mean, that would be ridiculous, right?  Hopefully we'll be
18 able to do that in both cases.  So any of the sort of big
19 policy issues that way, that has to be done in conjunction,
20 right?  I mean, it just wouldn't make sense to do it
21 otherwise.  But I do think there's enough unique discovery
22 here that we're not worried about that kind of duplication.
23        THE COURT:  Okay.  Last word, Ms. McLaren?
24        MS. McLAREN:  Plaintiffs' counsel specifically
25 said that these were people who had not been on the campus,

PROCEEDINGS 17

1  who were outside, they were blocking walls, they
2  were arrested for blocking walls.  It's exactly the same as
3  the plaintiffs in all the other allegations that plaintiffs
4  have brought in the Makkawi complaint.  The allegations are
5  the same; that this was content-based policing, that there
6  was excessive force used because of the content of the
7  message.  There's nothing unique about this one particular
8  protest.  That was the same thing in Makkawi.
9              THE COURT:  Okay.  It's a different protest.  I'm
10 not going to predetermine the facts.  There may be
11 differences, there may not be.  And we've been here before
12 in the George Floyd context.
13             So I'm deeming the motion as having been made, and
14 I'm denying it.  It will stay here in this court.
15             You folks are going to have to get with Judge
16 Marutollo to figure out a schedule for discovery.  You're
17 also going to have to work towards a coordination order, if
18 you will, like I think that they had in the George Floyd
19 protest cases.  I mean, that might be a little difficult
20 because the City's still working through the representation
21 issues in the Makkawi case.  It might take a little time,
22 but I think it's something you could probably start doing
23 now.  I mean, you have a template for it, so it shouldn't be
24 too hard.  But that's what we're going to do.
25             Do you have a date set with Judge Marutollo?  No,

PROCEEDINGS 18

1  I don't think so.  Yes, he adjourned everything sine die
2  pending resolution of the motion to change venue, which is
3  now resolved.  You'll get with him; he'll give you a date.
4           Okay.  Anything else?
5           MS. McLAREN:  No, Your Honor.
6           MR. RANKIN:  Not from plaintiff, Your Honor.
7           THE COURT:  Great.  Thank you, folks.
8           MS. McLAREN:  Thank you, Your Honor.
9           MS. MASSIMI:  Thank you, Your Honor.
10          (Matter adjourned.)
11
12                         *   *   *
13
14                  CERTIFICATE OF REPORTER
15
16  I certify that the foregoing is a correct transcript of the
17  record of proceedings in the above-entitled matter.
18
19   /s/ Kristi Cruz
    _____
20   Kristi Cruz RMR, CRR, RPR
     Official Court Reporter
21
22
23
24
25